# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1706

_____

Mitec Partners, LLC,             *
                          *
  Plaintiff - Appellant,         *
                          *   Appeal from the United States
  v.                         *   District Court for the
                          *   Northern District of Iowa.
U.S. Bank National Association,   *
                          *
  Defendant - Appellee.       *

_____

Submitted: February 9, 2010
Filed: May 24, 2010

_____

Before LOKEN, Chief Judge,[*] COLLOTON and GRUENDER, Circuit Judges.

_____

LOKEN, Chief Judge.

A group of Mitec, Inc. (Mitec), investors formed Mitec Partners, LLC (Mitec Partners), to purchase from U.S. Bank National Association (U.S. Bank) secured loans to Mitec that were in default. Their secret plan was to purchase Mitec's assets in foreclosure, wiping out Mitec's other investors. Mitec Partners purchased the loans, but the plan failed when the Small Business Administration (SBA) advised that U.S. Bank had subordinated two of its loans to SBA's secured loan to Mitec. Mitec

_____

[*]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

Partners then sued U.S. Bank in Iowa state court alleging, *inter alia*, fraud and negligent misrepresentation for failing to disclose the lienholder agreement with SBA before selling the loans to Mitec Partners. After U.S. Bank removed, the district court[1] granted summary judgment dismissing all claims. Mitec Partners appeals the dismissal of the fraud and negligent misrepresentation claims. Summary judgment is appropriate "if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005). Reviewing the grant of summary judgment *de novo*, we affirm. See Gregory v. Dillard's, Inc., 565 F.3d 464, 474 (8th Cir.) (en banc) (standard of review), cert. denied, 130 S. Ct. 628 (2009).

## I. Background

Mitec owns patented technology for irradiating beef. In June 2004, U.S. Bank made four loans to Mitec, a $400,000 equipment purchase loan, a $380,000 loan to prefund SBA financing, and two revolving working capital lines of credit totaling $300,000. All four loans were secured by a properly recorded lien on nearly all of Mitec's assets, including its patents. One year later, SBA guaranteed debentures whose proceeds were used to repay U.S. Bank's $380,000 term loan, and made a $391,000 loan to Mitec under its 504 loan program.[2] As part of these transactions, U.S. Bank and SBA entered into a third-party lienholder agreement. The agreement subordinated U.S. Bank's revolving lines of credit, but not its $400,000 equipment loan, to SBA's 504 loan. The agreement required U.S. Bank to notify SBA of a Mitec default and gave SBA the right to purchase U.S. Bank's security interests prior to any

---

[1]The HONORABLE LINDA R. READE, Chief Judge of the United States District Court for the Northern District of Iowa.

[2]For a description of SBA's 504 loan program, see United States v. Sobecki, 1998 WL 175870, at *2 (N.D. Ind. Mar. 26, 1998).

foreclosure sale. SBA filed a UCC financing statement on its loan to Mitec. Neither SBA nor U.S. Bank recorded the third-party lienholder agreement.

In 2006, Mitec defaulted. Duane Strempke, a vice president in U.S. Bank's Special Assets Division, and Brian Dalziel, president of Mitec, failed to rehabilitate the defaulted loans. Mitec then sent shareholder and loan guarantor Tim White to negotiate with Strempke. White was a lawyer who "had a fair amount of experience from a bank's point of view dealing with unfortunate loans." White testified that Strempke acted "like a pit bull" and described the unsuccessful negotiations as "not . . . friendly." At this point, a group of Mitec shareholders, including Tim White, formed Mitec Partners to purchase U.S. Bank's secured loans and acquire Mitec's assets at a foreclosure sale. All but one of Mitec Partners' members were investors in Mitec. Mitec Partners proceeded secretly, concerned that Dalziel would discover the plan and raise money to make the defaulted loans current, or locate a rival that could outbid Mitec Partners for Mitec's assets. James Peterson, president of Mitec Partners, testified that if its plan were successful, the other Mitec shareholders would be "wiped out" and would "lose their money."

Attorney Robert Downer represented Mitec Partners in negotiating the loan purchase with U.S. Bank's Strempke. After hard bargaining in negotiations Downer described as "cordial," Mitec Partners sent U.S. Bank a letter of intent (LOI) agreeing to purchase the loans for their full unpaid balance, approximately $640,000, with the exact price to be determined at closing. The LOI stated: "It is our understanding that [U.S.] Bank has forwarded all relevant documentation to Bob Downer for his review and that these documents will be received in his office today." Strempke signed the LOI for U.S. Bank after adding an Exhibit A which provided: "This LOI is intended to set forth the general terms of the loan purchase, with final definitive terms and conditions to be set forth in an Agreement and related assignments to be prepared by Mitec Partners, LLC's legal counsel and subject to U.S. Bank's approval." Mitec Partners signed Exhibit A.

Before closing, Strempke provided Mitec Partners with several documents related to the Mitec loans but not U.S. Bank's third-party lienholder agreement with SBA. Peterson testified that, prior to closing, when he asked Strempke how the SBA loan "plays into this," Strempke responded, "we'll scrape them off if you want us to," which Peterson understood to mean that U.S. Bank was the "senior lender." Strempke acknowledged that the lienholder agreement was material to the deal and testified that he would have provided it to Mitec Partners had he been aware of the agreement before the closing.

It is undisputed that no one from Mitec Partners ever asked U.S. Bank about the relative priority of the SBA loan. Nor did Mitec Partners contact SBA or Mitec for information about the SBA loan, no doubt because Mitec Partners was concealing its plans. Prior to closing, Downer searched public records, learning that SBA recorded a security interest in Mitec's assets after U.S. Bank's security interest, which reinforced Downer's belief that all U.S. Bank security interests were prior to SBA's interest. Downer never asked Strempke whether all U.S. Bank loans were senior to any other security interest in Mitec's assets. Nor did he collect and review Mitec documents in the possession of Mitec Partners' members. Stephen Carfrae, a founding member, had an SBA document in his files stating that "[a]t or prior to 504 Loan Closing, [U.S. Bank] must execute a Third Party Lender Agreement," and requiring that the SBA loan be secured by a lien on Mitec's equipment "[s]ubject only to the prior lien of [U.S. Bank] in the amount of $400,000." Downer admitted that, had he seen this document before closing, he would have "ascertained exactly what the SBA's position . . . would have been."

In November 2006, Mitec Partners purchased the loans for $642,211.34. The parties signed an integrated "Assignment Agreement" providing in relevant part:

> 4. <u>Disclaimer of Representations and Warranties</u>. . . . [U.S.] Bank
> (a) makes no warranty or representation and shall not be responsible for

any statement, warranty or representation made in or in connection with the Loan Documents . . . and (c) makes no warranty or representation and shall not be responsible for the . . . enforceability . . . or collectibility of the Loan Documents . . . .

     5. <u>Representations by Buyer</u>. The Buyer hereby acknowledges that it has, independently and without reliance upon [U.S.] Bank . . . and instead in reliance on . . . information provided by the Borrower [Mitec] and such other documents and information as the Buyer has deemed appropriate, made the Buyer's own credit analysis and decision to enter into this Assignment Agreement. The Buyer also acknowledges that it has reviewed and examined the Loan Documents and such related documents as it deemed appropriate . . . .

     7. <u>Miscellaneous</u>. This . . . Agreement . . . supersedes all oral statements and other writings with respect to the subject matter hereof.

In January 2007, when Mitec did not cure a notice of default, Mitec Partners scheduled a public auction of Mitec's assets and notified other creditors. SBA advised of its third-party lienholder agreement with U.S. Bank, and Mitec Partners did not proceed with the auction. This lawsuit followed.

## II. The Fraud Claim

The elements of a claim for fraudulent misrepresentation under Iowa law are that defendant made a material misrepresentation knowing it was false and intending to deceive the plaintiff, and that plaintiff acted in justifiable reliance on the truth of the representation and suffered damages proximately caused by the representation. <u>See Schaller Tel. Co. v. Golden Sky Sys., Inc.</u>, 298 F.3d 736, 745-46 (8th Cir. 2002).

Mitec Partners alleged damages caused by U.S. Bank's non-disclosure of its prior, third-party lienholder agreement with SBA before Mitec Partners purchased the U.S. Bank loans. "Iowa law recognizes a cause of action for fraudulent

misrepresentation based on nondisclosure of material facts." <u>Id.</u> at 740. But to be actionable as fraud, a non-disclosure "must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." <u>Wilden Clinic, Inc. v. City of Des Moines</u>, 229 N.W.2d 286, 293 (Iowa 1975); <u>see</u> <u>Sinnard v. Roach</u>, 414 N.W.2d 100, 105-07 (Iowa 1987). Here, although Mitec Partners' appellate briefs assert such a relationship in conclusory fashion, it did not allege in the complaint or submit evidence to the district court of a relationship of trust or confidence with U.S. Bank, or that relevant material facts were peculiarly within U.S. Bank's knowledge. Thus, for its fraud claim to survive summary judgment, Mitec Partners must present sufficient evidence of one or more material, intentional, affirmative misrepresentations by an agent of U.S. Bank.

**A.** The district court granted summary judgment on this claim because Mitec Partners failed to plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure. To satisfy Rule 9(b)'s standard-

> the complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby. . . . In other words, the complaint must plead the who, what, where, when, and how of the alleged fraud.

<u>Drobnak v. Andersen Corp.</u>, 561 F.3d 778, 783 (8th Cir. 2009) (quotation omitted). In addition to alleging the elements of a fraud claim in conclusory fashion, the fact section of Mitec Partners' complaint alleged: "Although Mitec Partners was aware that there was a second lien against the collateral in favor of [SBA . . . U.S.] Bank represented through the information and documentation it provided that the [U.S.] Bank loans were the primary lien on the collateral." These allegations were

inadequate, for they failed to reveal what the representations were, why they were false, why they were material, or who made them.

These omissions proved to be significant. U.S. Bank moved for summary judgment on this claim on the alternative grounds of failure to comply with Rule 9(b) and no evidence of an affirmative representation other than Strempke's statement to Peterson that U.S. Bank could "scrape off" SBA, which, as the district court later concluded, would not support a claim of fraud.[3] In response, Mitec Partners argued that its "understanding" stated in the LOI that U.S. Bank "has forwarded all relevant documentation to [attorney] Downer for his review" became, when Strempke signed the LOI, an affirmative misrepresentation that all relevant documentation had been disclosed. Thus, the fraud claim belatedly turned on an alleged misrepresentation by Strempke, who testified that he had no knowledge of the third-party lienholder agreement when he signed the LOI. Mitec Partners presented no evidence that this implied representation, not apparent from the face of the LOI, was false when made, much less knowingly false. In these circumstances, the failure to plead these critical elements of fraud at all, much less with particularity, warranted dismissal of this claim. See Schaller, 298 F.3d at 746; Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1070-71 (8th Cir. 1995).

**B.** The district court granted summary judgment on the fraud claim on the alternative ground that Mitec Partners failed to prove "justifiable reliance" on the alleged fraudulent misrepresentation, as required by Iowa law. We agree.

In fraud cases, the standard is "whether the complaining party, in view of his own information and intelligence, had a right to rely." Lockard v. Carson, 287

---

[3]There is no evidence the statement was false when made, much less intentionally false. Nor could Mitec Partners justifiably rely on this indefinite and ambiguous statement. See Caveman Adventures, UN, Ltd. v. United States Cellular Corp., 734 N.W2d 486, 2007 WL 911884, *4 (Iowa App. 2007) (unpublished).

N.W.2d 871, 878 (Iowa 1980). But "the recipient of a fraudulent representation . . . cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id., quoting Restatement (Second) of Torts § 541, Comment *a* (1971). The Supreme Court of Iowa considers eight factors helpful in determining the justifiable-reliance element of common-law fraud:

> (1) the sophistication and expertise of the plaintiff in financial . . . matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the . . . transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Spreitzer v. Hawkeye State Bank, 779 N.W.2d 726, 737 (Iowa 2009). Here, assuming without deciding that Strempke's act of signing an LOI stating Mitec Partners' "understanding" could be an actionable fraudulent misrepresentation that all material documents were provided,[4] these factors strongly support the district court's conclusion that Mitec Partners' alleged reliance was unjustified.

Mitec Partners and its attorneys initiated the loan purchase transaction and were sophisticated in business and financial matters. Mitec Partners and U.S. Bank did not have a fiduciary relationship, or a long-standing personal or business relationship, unlike the parties in Kaiser Agric. Chemicals v. Ottumwa Production Credit Ass'n, 428 N.W.2d 681, 683 (Iowa App. 1988). Mitec Partners had access to the relevant

---

[4]It is not apparent the phrase, "it is our understanding," could become an affirmative misrepresentation by U.S. Bank when Strempke signed the LOI. It was not an affirmative promise or statement of fact. Moreover, if Strempke believed that all relevant documents had been provided to Mitec Partners, as he testified, it was not a fraudulent misrepresentation, even if his understanding was incorrect.

-8-

information and many ways to determine that the unconcealed representation was untrue before the closing. Mitec Partners was aware of the SBA secured loan. Its members were investors in Mitec with access to that company's financial information. By contacting Mitec or SBA, Mitec Partners would have discovered the lienholder agreement. Indeed, Mitec Partners would have uncovered the loan-priority issue simply by reviewing documents in member Carfrae's own files. This failure to conduct basic due diligence may be explained by -- but cannot be excused by -- the fact that Mitec Partners hoped to keep its acquisition plans secret. The failure was akin to blindly relying on U.S. Bank's alleged misrepresentation.

Finally, the claim of justifiable reliance is refuted by Exhibit A, which expressly made the LOI subject to a final written agreement, and the Assignment Agreement, which declared that U.S. Bank had made no representations and Mitec Partners had relied on its own investigation. In general, under Iowa law, "contractual disclaimers are ineffective to bar a plaintiff from asserting a claim for fraudulent inducement." Northwest Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 726 (8th Cir. 2003). But the issue before us is different. The alleged fraudulent misrepresentation was made in a document that was itself subject to a subsequent, integrated contract that contained multiple, unambiguous disclaimers. Even in the case of alleged oral misrepresentations, which are never so explicitly circumscribed, "reliance on [an] oral representation . . . can be utterly unjustified in the face of a clear written contradiction." Spreitzer, 779 N.W.2d at 737-38; see also Smidt v. Porter, 695 N.W.2d 9, 22-23 (Iowa 2005). That is explicitly true here.

### III. The Negligent Misrepresentation Claim

The Supreme Court of Iowa generally recognizes the tort of negligent misrepresentation as it is defined in section 552 of the Restatement (Second) of Torts:

One who, in the course of his business, profession or other employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

However, unlike the Restatement, Iowa law draws a sharp distinction "between the person engaged in the business or profession of supplying guidance to others and those commercial transactions where the parties are dealing at arm's length." Haupt v. Miller, 514 N.W.2d 905, 910 (Iowa 1994). "This means the tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant." Sain v. Cedar Rapids Cmty. Sch. Dist., 626 N.W.2d 115, 126 (Iowa 2001), citing Fry v. Mount, 554 N.W.2d 263, 265-66 (Iowa 1996), which in turn cited four earlier cases including Haupt.

The district court granted summary judgment dismissing this claim because the loan purchase was an adversarial arm's length transaction and Mitec Partners presented insufficient evidence that U.S. Bank was "in the business or profession of supplying information in a nonadversarial capacity to the plaintiff." We agree. The Iowa courts have consistently rejected negligent misrepresentation claims based upon information that banks provided to prospective borrowers or guarantors in a loan transaction. See Sturm v. Peoples Trust & Sav. Bank, 713 N.W.2d 1, 2, 5 (Iowa 2006); Greatbatch v. Metro. Fed. Bank, 534 N.W.2d 115, 118 (Iowa App. 1995); Haupt, 514 N.W.2d at 909-10 (Iowa 1994). We see no difference between that type of arms-length transaction and U.S. Bank's sale of a loan portfolio to an unrelated party in this case. The alleged misrepresentation by U.S. Bank concerned information "incidental to the underlying financial transaction." Greatbatch, 534 N.W.2d at 118.

-10-

Alternatively, the district court dismissed the negligent misrepresentation claim, as well as the fraud claim, because Mitec Partners failed to present sufficient evidence of justifiable reliance.  We agree.  <u>See</u> <u>Vos v. Farm Bureau Life Ins. Co.</u>, 667 N.W.2d 36, 53 (Iowa 2003) (justifiable reliance is a common element in claims of fraud and negligent misrepresentation).

The judgment of the district court is affirmed.

_____