# IN THE SUPREME COURT OF IOWA

No. 15–1942

Filed May 12, 2017

**LAURIE FREEMAN, SHARON MOCKMORE, BECCY BOYSEL, GARY D. BOYSEL, LINDA L. GOREHAM, GARY R. GOREHAM, KELCEY BRACKETT,** and **BOBBIE LYNN WEATHERMAN,**

Appellees,

vs.

**GRAIN PROCESSING CORPORATION,**

Appellant.

---

Appeal from the Iowa District Court for Muscatine County, Thomas G. Reidel, Judge.

Defendant appeals district court ruling certifying case as a class action. **DISTRICT COURT CLASS CERTIFICATION ORDER AFFIRMED.**

Michael R. Reck, Mark McCormick, Charles F. Becker, and Kelsey J. Knowles of Belin McCormick, P.C., Des Moines; Steven J. Havercamp and Eric M. Knoernschild of Stanley, Lande & Hunter, P.C., Muscatine; and Joshua B. Frank of Baker Botts L.L.P., Washington, D.C., for appellant.

Sarah E. Siskind and Scott A. Entin of Miner, Barnhill & Galland, P.C., Madison, Wisconsin; James C. Larew of Larew Law Office, Iowa City; and Claire M. Diallo of Browne, Diallo & Roy, LLP, Princeton Junction, New Jersey, for appellees.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court abused its discretion by certifying this case as a class action. The plaintiffs are residents of Muscatine, Iowa, who live near a corn wet milling plant. The plaintiffs allege air pollution from the plant interferes with the use of their property. They have filed this lawsuit alleging state common law and statutory claims based on nuisance, trespass, and negligence theories. In a prior appeal, we held their claims were not preempted by the Federal Clean Air Act (CAA). *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 94 (Iowa 2014). On remand, the district court, over defendant's objections, granted the plaintiffs' motion for class certification and divided the class into two subclasses. For the reasons explained below, we affirm the class certification order.

## I. Background Facts and Proceedings.

Grain Processing Corporation (GPC) has operated its corn wet milling facility in Muscatine since 1943, converting corn kernels into products for commercial and industrial use. On April 23, 2012, eight Muscatine residents living near GPC filed a putative class action on behalf of "themselves and others who have resided within one and one-half miles from the perimeter" of GPC's facility within the preceding five years, an estimated 4000 residents. Their petition provides this overview of their claims:

> The plaintiffs allege the corn wet milling operation at GPC's facility creates hazardous by-products and harmful chemicals, many of which are released directly into the atmosphere. . . . They assert the polluting chemicals and particles are blown from the facility onto nearby properties. They note particulate matter is visible on properties, yards, and grounds and various chemical pollutants are also present. Compounding these adverse effects, according to the plaintiffs, GPC has used, continues to use, and has failed to replace its worn and outdated technology with available

technology that would eliminate or drastically reduce the pollution. The plaintiffs assert these emissions have caused them to suffer persistent irritations, discomforts, annoyances, inconveniences, and put them at risk for serious health effects.

*Id.* at 63–64. The plaintiffs limited their damage claims to loss of use and enjoyment of property, foregoing claims for diminution in value or personal injury.

GPC moved for summary judgment, asserting plaintiffs' common law and statutory claims were preempted by the CAA and Iowa Code chapter 455B (2011), Iowa's counterpart to the CAA. GPC's motion alternatively argued the lawsuit raised nonjusticiable political questions. The district court granted GPC's motion for summary judgment based on preemption and the political-question doctrine. The district court relied on a key federal preemption decision that subsequently was reversed on appeal. On our review, we concluded the plaintiffs' claims were not preempted or barred by the political-question doctrine. *Id.* at 83–85, 88–89, 93–94. We reversed the summary judgment and reinstated the lawsuit against GPC, relying in part on the new federal appellate decision filed after the district court's ruling. *See id.* at 65 n.2 & 94. We remanded the case to the district court.

**A. Plaintiffs' Motion for Class Certification.** The plaintiffs moved for class certification after remand. GPC resisted class certification on several grounds. The plaintiffs argued common questions of law and fact predominated over individual claims—a fundamental requirement for class certification. Common questions included "whether GPC violated its duty of care, whether the haze, odor, and smoke emitted from GPC [were] the product of negligence, and whether such emissions constituted negligence or unlawful trespass." The plaintiffs proposed a plan for adjudicating their claims. The plan

focused on three prongs: GPC's common course of conduct, proof of harm, and calculation of damages.

First, the plaintiffs proposed to show GPC's common course of conduct in knowingly creating a nuisance. They pointed to internal emails indicating GPC was aware of the pollution and the need to update equipment to improve air quality. For example, in 2008, Derek Biggs, GPC's plant manager, emailed coworkers observing, "At times when I was there, the parking lot and south end of Muscatine [were] covered in a haze, and if we had that odor, haze, etc. in Washington, we would have serious problems with the locals." Mick Durham, GPC's environmental director, received an email in 2010 from Kurt Levetzow, an employee of the Department of Natural Resources (DNR) who stated he was "amazed at a bluish colored haze that was leaving GPC's property and blanketing the residential neighborhood across from the plant." A 2012 email from Bill Chrisman, GPC senior process engineer, to Durham disclosed that over one weekend the facility's dryers caused "the neighborhood [to be] so smoky across the street that it was fairly hard to see, not to mention breathe." GPC engineers described the dryers as "antiquated," "deteriorating," "run down," and "older higher polluting."

The plaintiffs proposed to prove that GPC delayed fixing the problems by choosing to focus its resources elsewhere. Technologies to reduce emissions were available but not implemented at GPC's Muscatine plant. The plaintiffs characterized this common proof as the "most significant portion of the trial," stating,

> Whether it be a class case or an individual trial, there is going to be a lot of evidence, a significant amount of evidence regarding the culpability of GPC's conduct. That evidence will be the same, over and over again, for every single class member. Regardless if this case is tried once or tried hundreds or thousands of times, the same witnesses,

the same documents will be testified about, the same issues [will be presented].

The plaintiffs noted, "[T]hese conditions and GPC's knowledge of them are facts and evidence that reside at the heart of every class member's claims."

In the second phase, the plaintiffs proposed to focus on proof of harm: that every resident within one-and-a-half miles suffered a nuisance. The plaintiffs would offer three categories of evidence. The first addressed causation; it "revolve[d] around GPC's public admissions that its operation had been causing the smoke, the odor and the haze that had concerned the Muscatine community for years."

The next addressed harms suffered by the residents. The plaintiffs proposed to offer testimony from twenty to thirty "normal" persons living within the class boundaries, describing the common character of the harm. The plaintiffs submitted over 100 declarations from residents. Most described the smell emitted from the GPC plant as "burned corn" or "rotten eggs." Many mentioned dust-like particles accumulating on their lawns and homes. Sometimes the dust was white or gray, and sometimes it was darker. Most declarations indicated the smell or ash happened daily or nearly every day and mentioned symptoms of burning eyes and irritated sinuses. Many said they could not open windows or enjoy the outdoors due to the smell and dust. The plaintiffs alleged these declarations, together with residents' testimony, met the objective standard for nuisance: that normal persons in the community found the conditions offensive, annoying, or intolerable. The plaintiffs stated,

> Plaintiffs are prepared to present testimony from normal persons from all over the class area who regard GPC's pollution as definitely offensive, seriously annoying or intolerable. Whether they are, in fact, normal persons living in the community will be a jury question. But if so, and if the jury credits their testimony, it will establish that GPC

created a nuisance at their properties, and if in every portion of the class area normal persons testify that they experienced a nuisance, then it is permissible for a jury to infer that a nuisance has been suffered throughout the class area.

GPC could then present conflicting testimony from other residents within the class boundaries who did not experience similar harm or were not bothered by the emissions.

The final type of evidence plaintiffs intended to offer was air modeling data from Dr. Paul Rosenfeld. Dr. Rosenfeld plotted the dispersion of three types of emissions: volatile organic compounds (VOCs), particulate matter (PM10), and sulfur dioxide. These emissions were proxies for odor, smoke, and haze, respectively. Dr. Rosenfeld used AERMOD, an EPA-approved modeling algorithm that accounts for wind direction, wind speed, temperature, humidity, precipitation, and certain obstructions to estimate where the wind blew particles from GPC. Dr. Rosenfeld's model revealed pollutant concentrations and variations over time across the class area. He also developed a "wind rose" analysis, based on the sixteen cardinal wind directions, which he used to quantify the amount of time each property received "direct hits," or was downwind from, the emissions. Dr. Rosenfeld's data showed "the presence of the same pollutants frequently and repeatedly on every property in the class, and . . . the presence of those pollutants at properties closely surrounding the properties of the testifying normal persons." At the class certification hearing, the plaintiffs' counsel explained,

> And if you look at this, what you don't see, Your Honor, is during the hour of 5:00 to 6:00 a.m., a single solitary orange little cloud only covering the red cross that is Ms. Mockmore's property. What you do see is that when GPC's soup of pollutants are blown at Ms. Mockmore's property, all of the other parcels and properties in close

proximity to Ms. Mockmore's are similarly hit by GPC's soup of pollutants.

> And the Mockmore's property is not isolated in this observation, Your Honor. And this is important because this is why it supports the inference that we're asking the jury to make in this case, that when Ms. Mockmore or this normal person or that normal person testifies about his or her experience with GPC's pollutants . . . it is a reasonable inference for the jury to infer that similar properties in close proximity experience a similar nuisance[.]

"All of this evidence in combination, these three categories of evidence," the plaintiffs argued, "will support a reasonable inference by the jury that the nuisance conditions existed on every property in the class area."

Finally, for the third phase of the plaintiff's proposed trial strategy, the plaintiffs suggested a formula for calculating damages. Initially, they proposed using a simple per diem formula, in which the jury would assess a per-hour amount ($10 to $15) for the time each resident lived in the area. Alternatively, the plaintiffs proposed another, more exacting formula in which the jury's assigned baseline per-hour value would be multiplied by each property's "direct hit" hours and prorated based on each property's pollutant concentration. Pollution concentration, plaintiffs argued, could be calculated as follows:

> The formula takes the average concentrations of each of [VOCs, PM10s, and sulfur dioxide] present on each parcel and then sums them up to arrive at a property-specific concentration total and to determine how that compares to the total concentrations of the hardest hit property. And we refer to the hardest hit property as the baseline for all others. The formula divides the concentration total for each property into the . . . baseline total.

Plaintiffs acknowledged that because the model measures only the amount of time a property is hit by emissions, lower concentration totals may measure emissions that residents would not notice. It would be left for the court and jury to identify what total concentration level, if any, constituted a nuisance. The plaintiffs admitted this formula does not

account for time class members spent asleep or away from their property, but asserted the formula was permitted under our caselaw allowing approximation of damages.

To the extent issues remained concerning individual damages, the plaintiffs contended these issues could be litigated during a "claims administration process typical to class actions." During this process, individual factors such as tenure of the residents and proximity to other sources of pollution could be addressed.

**B. GPC's Resistance to Certification.** GPC argued the residents' claims were inherently individual, and as such, individual issues predominated over those common to the class. GPC pointed to variances in testimony submitted by the residents. For example, their descriptions of GPC's emissions differed, such as "yellow dust," "syrupy, sticky residue," "similar to pencil shavings," "sticky, brownish tan particulates," "small black pellets like peppercorns," or "dust that looks like fur." Some residents had moved into the neighborhood with knowledge of the emissions, while others were unaware before moving. The neighbors had lived in the area for varying periods, some moving to the area after the lawsuit was filed and others living there for over fifty years. Some stated they may have received reduced pricing on their homes because of the pollution. Some lived closer to other emission sources, such as a wastewater treatment plant or railroad. GPC identified seven residents (out of over 100 declarants) who stated they never had been prevented from doing anything outdoors because of the smells or emissions. Even these residents, however, acknowledged the prevalent odor in their neighborhood from GPC's facility. The individual issues, GPC argued, necessitated a property-by-property, person-by-person analysis to determine whether GPC's conduct created a nuisance.

GPC also resisted the residents' phased trial strategy. Specifically, GPC objected to the use of lay testimony to infer classwide harm. GPC noted a class action must "rise or fall" with the named plaintiffs. Allowing the jury to infer, from representative testimony, conditions on surrounding properties, GPC argued, would impermissibly alleviate each resident's burden to prove nuisance on his or her property. Moreover, using inferences would mask individual issues, hindering individual defenses and thereby depriving GPC of due process.

GPC submitted expert testimony criticizing Dr. Rosenfeld's model and corresponding allocation of damages. It alleged the model was flawed because it combined disparate substances (VOS, PM10, and sulfur dioxide) to reach an aggregate total, even though properties with differing concentrations of these substances would experience differing harms. The model showed concentration totals on a linear scale, although testimony established that emissions would not be experienced linearly. A property with a concentration total of 200 would not suffer double the lost use of enjoyment as one with 100. The model only accounted for wind direction and failed to account for hours during which the residents were sleeping, on vacation, or otherwise away from home. Because the model measured emissions hitting the property even at levels that would not be perceptible, let alone cause compensable harm, GPC argued the model did not establish a nuisance. GPC also noted the residents' model and formula could not measure any alleged trespass or negligence by GPC.

**C. The District Court's Decision.** The district court granted class certification. Noting its authority to modify or decertify the class at any time, the district court divided the class into two subclasses, one for members in close proximity to GPC, and the other for those in peripheral

proximity. The court reasoned that plaintiffs' air dispersion analysis "yields results one would expect—properties in close proximity have comparable 'Concentration Totals' and direct-hit hours." Therefore, "named plaintiffs suffer the most comparable harm to absent class members who live in close proximity, and the closer the proximity the more analogous the harm." The court sorted six named plaintiffs into the close-proximity subclass and two into peripheral proximity.

The district court further determined that common issues of law and fact existed and that common issues predominated over individual ones. Common issues included GPC's course of conduct, its knowledge of the pollution, and its level and duration of emissions. Addressing GPC's concerns, the district court, citing *Miller v. Rohling*, 720 N.W.2d 562 (Iowa 2006), stated,

> Because Iowa measures the existence of nuisance-level harm objectively, a nuisance claim brought under Iowa law is not inherently individual. Indeed, Iowa's objective standard renders many of Defendant's Due Process arguments—idiosyncratic sensitivities, physical infirmities, life style choices, preferences for use and enjoyment, housekeeping habits—immaterial to proving nuisance. Further, Iowa's objective-nuisance standard supports Plaintiffs' plan for presenting the jury with lay testimony from witnesses—whom the jury can find are "normal persons living in the community"—to prove the class-wide impact of the alleged nuisance throughout each subclass area.

> *Miller* also supports Plaintiffs' proposed use of formulaic damages. *Miller* upheld the trial court's formulaic use of an identical per hour dollar value for all of the plaintiffs notwithstanding differences in their proximity to the sources of the pollution. *Miller* also approved the trial court multiplying an identical per hour dollar value by sixteen hours a day—because it assumed that "most normal people would be out of their home a period of eight hours a day." . . . *Miller* approving formulaic damages based on reasonable inferences and approximation renders more of Defendant's Due Process arguments—each class member living in a different proximity to the source of the pollution, the varying rate of emission over time, the varying velocity and direction of the wind, and the number of hours each

plaintiff was actually or wakefully present at his or her property—immaterial to proving nuisance.

The district court concluded, "Due to the remedial nature of our class action rules, the manageability concerns raised by Defendant's arguments are presently insufficient to deny certification."

GPC appealed as of right. *See* Iowa R. Civ. P. 1.264(3) ("An order certifying or refusing to certify an action as a class action is appealable."). GPC argues the district court abused its discretion in certifying the class and that certification infringed upon its due process rights. We retained the appeal.

## II. Standard of Review.

"Our review of the district court's ruling granting or denying certification of a class is limited because the district court enjoys broad discretion in the certification of class action lawsuits." *Legg v. W. Bank*, 873 N.W.2d 756, 758 (Iowa 2016) (quoting *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 44 (Iowa 2003)). We review a district court's class certification ruling for abuse of discretion. *Id.* The district court abuses its discretion when its "grounds for certifying a class action are clearly unreasonable." *Id.* If the district court " 'weigh[ed] and consider[ed] the factors and [came] to a reasoned conclusion as to whether a class action should be permitted for a fair adjudication of the controversy,' we will affirm." *Anderson Contracting, Inc. v. DSM Copolymers, Inc.*, 776 N.W.2d 846, 848 (Iowa 2009) (alterations in original) (quoting *Luttenegger v. Conseco Fin. Servicing Corp.*, 671 N.W.2d 425, 437 (Iowa 2003)). To the extent GPC argues certification infringes upon its due process right to present a defense, our review is de novo. *Kragnes v. City of Des Moines*, 810 N.W.2d 492, 498 (Iowa 2012).

### III. Analysis.

We must decide whether the district court abused its discretion by certifying this class action. GPC contends that commonality, a question of law or fact common to the class, is not present as required under Iowa Rule of Civil Procedure 1.261(2). GPC relatedly argues common issues of law or fact do not predominate over individual issues, a factor it contends the district court failed to sufficiently weigh when concluding a class action should be permitted for the fair and efficient adjudication of the controversy. *See* Iowa R. Civ. P. 1.263(1)(*e*). We determine that common issues of law or fact exist and predominate over individual issues. Finally, GPC argues the certification order violates due process by interfering with its right to litigate individual defenses. We disagree and conclude GPC will be able to litigate individual issues. We hold the district court did not abuse its broad discretion in certifying this class action.

**A. Whether the District Court Abused Its Discretion by Certifying the Class Action.** Iowa Rules of Civil Procedure 1.261 through 1.263 govern class actions. Under rule 1.262, the district court may certify a class action if it finds all of the following:

> *a.* The requirements of rule 1.261 have been satisfied.
>
> *b.* A class action should be permitted for the fair and efficient adjudication of the controversy.
>
> *c.* The representative parties fairly and adequately will protect the interests of the class.

*Id.* r. 1.262(2). Rule 1.261 provides parties may sue as a class when "[t]he class is so numerous . . . that joinder of all members . . . is impracticable" and "[t]here is a question of law or fact common to the class." *Id.* r. 1.261(1)–(2). "A failure of proof on any one of the prerequisites is fatal to class certification." *City of Dubuque v. Iowa*

*Trust*, 519 N.W.2d 786, 791 (Iowa 1994). But at the class certification stage, "the proponent's burden is light." *Id.* The class action rules should be "liberally construed and the policy should favor maintenance of class actions." *Lucas v. Pioneer, Inc.*, 256 N.W.2d 167, 175 (Iowa 1977). The goal of the rules is the

> efficient resolution of the claims or liabilities of many individuals in a single action, the elimination of repetitious litigation and possibly inconsistent adjudications involving common questions, related events, or requests for similar relief, and the establishment of an effective procedure for those whose economic position is such that it is unrealistic to expect them to seek to vindicate their rights in separate lawsuits.

*Comes v. Microsoft Corp.*, 696 N.W.2d 318, 320 (Iowa 2005) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1754, at 49 (2d ed. 1986) [hereinafter Wright]).

Rule 1.263(1) lists thirteen factors the district court may consider in determining whether "the class action should be permitted for the fair and efficient adjudication of the controversy."[1] Iowa R. Civ. P. 1.263(1).

---

[1]Rule 1.263(1) provides,

In determining whether the class action should be permitted for the fair and efficient adjudication of the controversy, as appropriately limited under rule 1.262(3), the court shall consider and give appropriate weight to the following and other relevant factors:

    *a.* Whether a joint or common interest exists among members of the class.

    *b.* Whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for a party opposing the class.

    *c.* Whether adjudications with respect to individual members of the class as a practical matter would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

    *d.* Whether a party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final

These factors "center on two broad considerations: 'achieving judicial economy by encouraging class litigation while preserving, as much as possible, the rights of litigants—both those presently in court and those who are only potential litigants.'" *Vos*, 667 N.W.2d at 45 (quoting *Vignaroli v. Blue Cross of Iowa*, 360 N.W.2d 741, 744 (Iowa 1985)).

A key factor is whether "common questions of law or fact predominate over any questions affecting only individual members." Iowa R. Civ. P. 1.263(1)(*e*). "[T]he language of rule 1.263 indicates the district court has 'considerable discretion' in weighing the factors." *Anderson Contracting*, 776 N.W.2d at 848 (quoting *Vignaroli*, 360 N.W.2d at 744). The district court decides what weight, if any, to give each of the factors and may weigh one factor more heavily than another. *Id.*

---

injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.

*e.* Whether common questions of law or fact predominate over any questions affecting only individual members.

*f.* Whether other means of adjudicating the claims and defenses are impracticable or inefficient.

*g.* Whether a class action offers the most appropriate means of adjudicating the claims and defenses.

*h.* Whether members who are not representative parties have a substantial interest in individually controlling the prosecution or defense of separate actions.

*i.* Whether the class action involve a claim that is or has been the subject of a class action, a government action, or other proceeding.

*j.* Whether it is desirable to bring the class action in another forum.

*k.* Whether management of the class action poses unusual difficulties.

*l.* Whether any conflict of laws issues involved pose unusual difficulties.

*m.* Whether the claims of individual class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class.

"Whether or not we agree with the decision arrived at by the trial court is not the issue. The issue is one of abuse of discretion." *Id.* (quoting *Martin v. Amana Refrigeration, Inc.*, 435 N.W.2d 364, 369 (Iowa 1989)). The district court has considerable leeway when deciding whether to certify the class. *See, e.g., Legg*, 873 N.W.2d at 761–62 (affirming class certification and noting broad discretion); *Kragnes*, 810 N.W.2d at 500 ("We find no abuse of the district court's broad discretion in certifying and refusing to decertify the class."); *Varner v. Schwan's Sales Enters., Inc.*, 433 N.W.2d 304, 306 (Iowa 1988) (concluding the district court did not "abuse[] its discretion in denying certification).

GPC does not contest numerosity. *See Legg*, 873 N.W.2d at 759 (noting numbers alone are dispositive to show numerosity and impracticality is presumed if the class has over forty members). Nor does GPC contest the adequacy of the named plaintiffs to represent the class. Rather, GPC argues that the district court erred in certifying the class because the requirement of commonality was not met. GPC also contends individual issues predominate over common questions of law or fact. We address each argument in turn.

1. *Commonality.* GPC relies on federal authority in arguing the commonality requirement is lacking here. Iowa's "rules regarding class actions[] closely resemble Federal Rule of Civil Procedure 23." *Vos*, 667 N.W.2d at 44. We have relied on "federal authorities construing similar provisions" of the federal rule to interpret our state counterpart. *Id.* The federal rule requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).[2]

---

[2]Federal Rule 23 provides in relevant part,

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

> **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

> **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23 (a)–(b).

GPC argues *Wal-Mart Stores, Inc. v. Dukes*, supports its challenge to the district court's determination on commonality. 564 U.S. 338, 349, 131 S. Ct. 2541, 2551 (2011). In *Dukes*, the plaintiffs sought to certify a class action of all women employed at Wal-Mart stores nationwide since 1998, alleging Wal-Mart's promotion policies discriminated on the basis of sex in violation of Title VII. *Id.* at 346, 131 S. Ct. at 2549. The *Dukes* Court noted commonality "is easy to misread, since '[a]ny competently crafted class complaint literally raises common "questions" ' " *Id.* at 349, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). But "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' " *Id.* at 349–50, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, 102 S. Ct. 2364, 2370 (1982)). It was not sufficient that class members "have all suffered a violation of the same provision of law." *Id.* at 350, 131 S. Ct. at 2551. Rather, "claims must depend on a common contention" of "such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* To satisfy the commonality requirement, " '[e]ven a single [common] question' will do." *Id.* at 359, 131 S. Ct. at 2556 (alteration in original) (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n.10 (2003)).

The *Dukes* Court concluded that no common question of law or fact was present. *Id.* at 359, 131 S. Ct. at 2556–57. Unlike an "assertion of discriminatory bias on the part of the same supervisor," the class members

held a multitude of different jobs, at different levels of Wal-Mart hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed . . . .

*Id.* at 350, 359–60, 131 S. Ct. at 2551, 2557 (alteration in original) (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (Kozinski, C.J., dissenting)). The employees failed to identify a specific employment practice tying together their nationwide claims. *Id.* at 357, 131 S. Ct. at 2555.

By contrast, the district court here found several common questions of both law and fact. The class includes only "members who live in the vicinity of Defendant's Muscatine facility and allegedly suffered damages from Defendant's course of conduct." GPC engaged in a common course of conduct regarding all class members.

> Specifically, Defendant operated outdated, high-polluting dryers and coal-boilers, with virtually no controls to reduce emissions, [which] purportedly released noxious smoke and odor and haze into the surrounding neighborhoods for years, which caused a class-wide nuisance. Almost identical evidence will be required to establish the level and duration of Defendant's emissions, the reasonableness of Defendant's operations, and the causal connection, if any, between the injuries allegedly suffered and Defendant's liability.

Although the "nature and amount of damages" may differ for each class member, the district court concluded, "The central factual basis for all of Plaintiff's claims . . . is GPC's course of conduct and knowledge of its potential hazards. Thus, Plaintiffs' theory presents a common nucleus of operative fact." We agree. All class members allegedly suffered a common injury—air pollution emanating from GPC that interfered with the use and enjoyment of their property.

GPC argues the named plaintiffs did not suffer the same injury as other class members. "[A] class representative must be part of the class

and 'possess the same interest and suffer the same injury' as class members." *Hammer v. Branstad*, 463 N.W.2d 86, 90 (Iowa 1990) (alteration in original) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 1896 (1977)). Initially, the district court was "not persuaded class representatives ha[d] suffered the same injury shared by all members of the class." The court observed that Sharon Mockmore, the class member located closest to GPC, experienced a "concentration total" of 317.21, while Bobbie Lynn Weatherman, the class member located furthest from GPC, experienced a "concentration total" of only 71.50. Thus, "the effects of Defendant's emissions at the edge of the class boundary [could not] be inferred from the testimony of class members living in close proximity to Defendant." But the district court resolved that disparity by creating two subclasses, entitled "close proximity" and "peripheral proximity," and grouping the named plaintiffs accordingly. Within these subclasses, the district court found the named plaintiffs were "ideal representatives for absent class members who live nearby." Our rules allow the district court to define subclasses. Iowa R. Civ. P. 1.262(3)(*c*) ("If appropriate, the court may do any of the following: . . . Divide a class into subclasses and treat each subclass as a class.").

Other courts applying equivalent class action rules have determined the commonality requirement was met when neighboring property owners sued a polluter under nuisance or negligence theories. *See Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) ("Here, the district court recognized that the issues of General Mills' standardized conduct of alleged contamination and the remedies sought by the class are common to all plaintiffs . . . ."); *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 457 (D.N.J. 2009) (commonality present for

nuisance claim alleging groundwater contamination); *Collins v. Olin Corp.*, 248 F.R.D. 95, 101 (D. Conn. 2008) (finding common questions existed as to polluter's course of conduct for contaminated soil and water); *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141, at *3 (N.D. Ill. Aug. 12, 2002) ("Plaintiffs allege this contamination constitutes standardized conduct towards all proposed class members and there are therefore common questions of law and fact."); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D. Ohio 1991) (stating plaintiffs had identified common questions of extensiveness of emissions, what caused them, what precautions were taken, and economic impact of emissions); *Berdysz v. Boyas Excavating, Inc.*, ___ N.E.3d ___, ___, 2017 WL 632445, at *6 (Ohio Ct. App. Feb. 16, 2017) (finding common issues and affirming certification in air pollution case).

We reach the same conclusion under this record and hold the district court did not abuse its discretion in finding the commonality requirement was satisfied within the two subclasses.

2. *Predominance.* The question of whether common or individual issues predominate has been characterized as "fairly complex." *Vignaroli*, 360 N.W.2d at 744. "Inherent in our inquiry into the predomination issue is the recognition [that] the class action device is appropriate only where class members have common complaints that can be presented by designated representatives in the unified proceeding." *Id.* Predominance "necessitates a 'close look' at 'the difficulties likely to be encountered in the management of a class action.'" *Vos*, 667 N.W.2d at 46 (quoting *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 28–29 (D.N.H. 1998)). The predominance inquiry is "qualitative rather than quantitative"; merely "*a* common question does not end the inquiry." *Ebert*, 823 F.3d at 478; *see also* William B.

Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed.), Westlaw (database updated Dec. 2016) [hereinafter *Newberg*].

Individual claims need not "be carbon copies of each other" to determine common issues predominate. *Vignaroli*, 360 N.W.2d at 745. The test for predominance "is a pragmatic one." *Luttenegger*, 671 N.W.2d at 437.

> *When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than an individual basis. . . .* [C]ourts have held that a [class action] can be brought . . . even though there is not a complete identity of facts relating to all class members, as long as a "common nucleus of operative facts" is present. . . .
>
> The common questions need not be dispositive of the entire action. In other words, "predominate" should not be automatically equated with "determinative" or "significant." *Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the [class] action will be considered proper.*

*Id.* (alterations in original) (quoting Wright § 1778, at 528–33). "A claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Vos*, 667 N.W.2d at 45 (quoting *Cope v. Metro. Life Ins. Co.*, 696 N.E.2d 1001, 1004 (Ohio 1998)).

The district court issued a forty-seven-page ruling, with eleven pages addressing predominance. *See Anderson Contracting*, 776 N.W.2d at 849 (noting the thoroughness of the district court's ruling). Ultimately, the district court determined,

> While variations in the individual damage claims are likely to occur and other sources of emissions may pose unusual difficulties, common questions of law or fact regarding Defendant's liability predominate over questions affecting only individual class members such that the subclasses

should be permitted for the fair and efficient adjudication of this controversy.

The district court also addressed the other factors considered under rule 1.263(1).

> One of the purposes of class action procedures "is to provide small claimants an economically viable vehicle for redress in court." [*Martin*], 435 N.W.2d at 366. . . . Given the complexities of the liability issue and the expenses of this litigation, the claims of individual class members are insufficient in the amounts or interests involved to afford significant relief to the proposed subclass members without certification of the subclasses. Finally, class action will establish Defendant's liability in a single proceeding for thousands of Muscatine residents. This will avoid unacceptable costs and repetition for both parties.

In *Comes*, we emphasized the district court's broad discretion to weigh the thirteen factors in deciding class certification.

> In most cases some of the thirteen factors [regarding the fair-and-efficient-administration-of-justice test] will weigh against certification and some will weigh in favor. It is for the trial court, employing its broad discretion, to weigh the competing factors and determine whether a class action will provide a fair and efficient adjudication of the controversy. Thus, even if [defendant] is correct in its assertion four of the factors weigh against certification, that does not preclude the court from certifying the class action if, in its opinion, those factors are outweighed by other factors supporting certification.

*Comes*, 696 N.W.2d at 322 (quoting *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 289 (N.D. 2003)).

"Further, a safety net is provided for cases in which certification is improvidently granted: the court may decertify the class at a later time." *Id.* at 324; *see also Vos*, 667 N.W.2d at 54–55 (affirming district court's decision to *decertify* class because individual issues predominated). Or the district court may bifurcate the trial into separate phases for liability and damages. *See Hammer*, 463 N.W.2d at 88; *see also Newberg* § 10:6

("[A] common use of bifurcation . . . is to try liability issues to a jury before damages . . . ."). When

> defendant's activities present a "common course of conduct" so that the issue of statutory liability is common to the class, the fact that damages . . . may vary for each party does not require that the class action be terminated.

*Legg,* 873 N.W.2d at 759–60 (alterations in original) (quoting *Luttenegger,* 671 N.W.2d at 437).

"Certification of a class action does not depend on a determination of whether the plaintiffs will ultimately prevail on the merits." *Vos,* 667 N.W.2d at 45. However, determining whether the requirements for class certification are met "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes,* 564 U.S. at 351, 131 S. Ct. at 2551. Nonetheless, we decline to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. ___, 133 S. Ct. 1184, 1194–95 (2013). The merits should be analyzed only to the extent relevant in determining whether the rules have been satisfied. *Id.* at ___, 133 S. Ct. at 1196.

We begin, as the district court did, with the plaintiffs' first cause of action, nuisance. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir. 2001) ("To determine whether the claims alleged by the putative class meet the requirements for class certification, we must first examine the underlying cause of action . . . ."). The legislature has defined nuisance as "[w]hatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property." Iowa Code § 657.1(1) (2015). Under section 657.2(1), "occasioning noxious exhalations, unreasonably offensive smells, or other annoyances, [which] becomes

injurious and dangerous to the health, comfort, or property of individuals or the public" constitute a nuisance. *Id.* § 657.2(1).

The nuisance statute does not supersede common law nuisance. *See Freeman*, 848 N.W.2d at 67. Rather, statutory nuisance claims are "supplemented by common law principles governing private nuisances." *Perkins v. Madison Cty. Livestock & Fair Ass'n*, 613 N.W.2d 264, 271 (Iowa 2000). We have defined a common law nuisance as "an actionable interference with a person's interest in the private use and enjoyment of the person's land." *Id.* (quoting *Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996)).

> Whether a lawful business is a nuisance depends on the reasonableness of conducting the business in the manner, at the place, and under the circumstances in question. Thus the existence of a nuisance does not depend on the intention of the party who created it. Rather, it depends on the following three factors: priority of location, the nature of the neighborhood, and the wrong complained of.

*Id.* (quoting *Weinhold*, 555 N.W.2d at 459). Alleged nuisances are assessed under an "objective, normal-person" standard. *Id.* "Thus, if 'normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable' then the invasion is significant enough to constitute a nuisance." *Id.* (quoting *Weinhold*, 555 N.W.2d at 459).

Whether a nuisance exists is a factual inquiry. *Patz v. Farmegg Prods., Inc.*, 196 N.W.2d 557, 561 (Iowa 1972). To recover against GPC, the plaintiffs must establish common facts as to "priority of location, the nature of the neighborhood [involving common proof assessing the locale], and the wrong complained of." *Perkins*, 613 N.W.2d at 271.

At oral argument and in their appellate brief the plaintiffs conceded priority of location favored GPC as to all class members. GPC's

operations commenced in 1943, and in the words of plaintiffs' counsel, a resident would have had to be "living under a rock" not to know of GPC's activities in the neighborhood. The plaintiffs have also eliminated many individual issues by confining their claims to property damages without claiming diminution in value or alleging personal injury claims. Any class member may opt out.[3] *See* Iowa R. Civ. P. 1.267(1) (allowing putative class member to "elect to be excluded" unless he or she is a class representative, there has been an affirmative finding under rule 1.263(*a*), (*b*), or (*c*), or a counterclaim has been asserted against the member).

Because the "normal person" standard is an objective one, any idiosyncratic sensitivity, physical infirmities, lifestyle choices, preferences for use and enjoyment, or housekeeping habits are immaterial to proving whether defendant's conduct created a nuisance. *See, e.g., Miller*, 720 N.W.2d at 569 (awarding damages despite witness testimony emissions were "not that bothersome"). Objective standards more readily present common questions than subjective standards. *See Amgen*, 568 U.S. at ___, 133 S. Ct. at 1191. In *Amgen*, the United States Supreme Court evaluated whether the objective element of "materiality" was a common or individual question when deciding whether to certify a class action alleging securities fraud.

---

[3]Indeed, at least seventeen individual class-member plaintiffs have filed expedited civil actions. *See* Pl.'s Appl. for Interlocutory Appeal, *Wittenberg v. Grain Processing Corp.*, No. 17–0058 (filed Jan. 12, 2017) (six individuals); Pl.'s Appl. for Interlocutory Appeal, *Tate v. Grain Processing Corp.*, No. 17–0062 (filed Jan. 12, 2017) (eleven individuals). These expedited civil actions allege property and medical damages, while the *Freeman* class members have limited damages to lost use and enjoyment. The individual plaintiffs stated they chose the expedited civil action forum because of the opportunity to have cases resolved more expeditiously than a class claim. *See* Iowa R. Civ. P. 1.281(4)(*b*) ("Unless that court otherwise orders for good cause shown, expedited civil actions must be tried within one year of filing.").

> Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class. . . . The alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class. As vital, the plaintiff class's inability to prove materiality would not result in individual questions predominating. Instead, a failure of proof on the issue of materiality would end the case, given that materiality is an essential element of the class members' securities-fraud claims. As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison.

*Id.* Similarly, if the residents fail to demonstrate that a normal person in the locality would find the conditions existing throughout the subclass area "definitely offensive, seriously annoying or intolerable," then the residents will fail to meet their burden, and the claim will fail. *Weinhold*, 555 N.W.2d at 459 (quoting Restatement (Second) of Torts § 821F cmt. *d*, at 106 (1979)).

Given the plaintiffs' showing that the three factors—priority of location, the nature of the neighborhood, and the wrong complained of— are objective, common factors, it appears the factual determination of whether a nuisance exists is capable of being made on a classwide basis.

GPC argues *Perkins* is fatal to class certification because it applied a property-by-property determination to resolve nuisance claims, showing that individual issues will predominate over common questions. 613 N.W.2d at 273 ("We examine each plaintiff's claim independently of the other plaintiffs' claims so that a plaintiff's claim will succeed or fail on the basis of that plaintiff's particular circumstances."). We disagree that *Perkins* requires reversal. In *Perkins,* neighboring property owners brought a nuisance action in equity against operators of a figure-eight auto racetrack built on the county fairgrounds. *Id.* at 268. The plaintiffs all lived in their homes nearby before the racetrack was built and thus had priority of location. *Id.* at 271–72. Races occurred seven nights a

year. *Id.* at 272. The district court denied recovery, finding " 'the seven time invasion' did not rise to the level of a nuisance." *Id.* at 272–73. We applied de novo review and affirmed as to three of the property owners located between 975 and 1150 feet from the track. *Id.* at 273–74. But we reversed as to one plaintiff who lived adjacent to the fairgrounds and whose yard was seventy-seven feet from the racetrack. *Id.* at 274. She testified the pit area, located on her property line, was "extremely noisy" and that "[l]ights, noise, dust, smoke and exhaust fumes emanate from the track and pit area directly onto [her] property, including the house." *Id.* We found she proved her nuisance claim while the other property owners (who lived the length of three to four football fields away) did not. *Id.*

*Perkins* is distinguishable. It was not a class action. We reviewed the evidence de novo to decide the merits of the nuisance claims. *Id.* at 267. By contrast, we are reviewing here the district court's procedural ruling on class certification for abuse of discretion. The merits of the nuisance claims will be decided at trial. The district court appropriately divided the case into two subclasses, based on the distance from the source of the alleged nuisance. Moreover, *Perkins* did not involve *negligence* claims in which the reasonableness of the defendant's conduct is an issue common to all the neighboring property-owner plaintiffs.

Negligence and nuisance are distinct theories. *Dalarna Farms v. Access Energy Coop.*, 792 N.W.2d 656, 659 (Iowa 2010). We explained the distinction between the two in *Bormann v. Board of Supervisors*, stating,

> Negligence is a type of liability-forming conduct, for example, a failure to act reasonably to prevent harm. In contrast, nuisance is a liability-producing condition. Negligence may

> or may not accompany a nuisance; negligence, however, is not an essential element of nuisance. If the condition constituting the nuisance exists, the person responsible for it is liable for resulting damages to others even though the person acted reasonably to prevent or minimize the deleterious effect of the nuisance.

584 N.W.2d 309, 315 (Iowa 1998) (citations omitted). In other words, nuisance is a condition, not an act or failure to act by the party responsible. *See id.*

> [T]he true distinction between negligence and nuisance is that "to constitute a nuisance 'there must a degree of danger (likely to result in damage) *inherent* in the thing itself, beyond that arising from a mere failure to exercise ordinary care.' "

*Dalarna Farms*, 792 N.W.2d at 659 (quoting *Martins v. Interstate Power Co.*, 652 N.W.2d 657, 661 (Iowa 2002)).

Under both nuisance and negligence theories, the harm caused by the defendant's conduct is relevant. In *Martins*, the plaintiffs claimed electrical transmission lines emitted stray voltage, harming dairy cows on an adjoining farm and reducing milk production. 652 N.W.2d at 659. Stray voltage was an "*inherent* part of supplying electricity," but problems in electrical systems could increase its frequency. *Id.* at 662 (quoting Peter G. Yelkovac, *Homogenizing the Law of Stray Voltage: An Electrifying Attempt to Corral the Controversy*, 28 Val. U. L. Rev. 1111, 1112–13 (1994)). To constitute a nuisance, we pointed out the "degree of danger likely to result in damages must be *inherent* in the thing itself." *Id.* at 664. We concluded "[e]xcessive stray voltage from an electric utility resulting in damage to a dairy herd [met] that test." *Id.* Assessing whether GPC's conduct created an inherent risk of danger will be a common legal question affecting both the plaintiffs' nuisance (the resulting condition) and negligence (the reasonableness of the conduct) claims.

In addition, the plaintiffs' negligence claims will require evidence of GPC's course of conduct, its duty of care and corresponding breach, and its knowledge of the harms caused. *Raas v. State*, 729 N.W.2d 444, 447 (Iowa 2007) (noting to establish claim of negligence plaintiffs must show "a duty of care," a breach of duty, that the breach "was a proximate cause of their injuries," and damages). The plaintiffs' plan to offer evidence GPC could have upgraded its coal-burning equipment with cleaner burning, natural gas-fired equipment earlier, and had it done so, much of the air pollution would have been avoided. Whether GPC acted unreasonably by delaying that equipment upgrade appears to be a common issue.

Proving trespass will involve similar common evidence, such as whether harms can be attributed to GPC and whether emissions interfered with the residents' exclusive land possession. *See Freeman*, 848 N.W.2d at 67 (addressing cases deciding whether air pollution constituted a trespass). GPC's arguments against certifying these claims go to the merits.[4]

Class action treatment appears to be the most efficient way to resolve these issues. *See* Iowa R. Civ. P. 1.263(1)(*g*) (instructing court to consider whether class action "offers the most appropriate means of adjudicating the claims and defenses"). Moreover, the complexity of these questions may hinder the ability of some class members to get relief due to the expense of expert testimony. *Id.* r. 1.263(1)(*m*) (directing consideration of "[w]hether the claims of the individual class members are insufficient in the amounts or interests involved, in view of the

---

[4]For example, GPC asserts that no physical invasion is shown by Dr. Rosenfeld's model, that GPC did not cause the physical invasion because testing of residue revealed it was from another source, and that even nonnegligently run mills produce emissions.

complexities of the issues and the expenses of litigation, to afford significant relief to the members of the class"). The district court acted within its discretion in concluding that individual differences among class members were not fatal to class certification.

GPC contends individual issues of causation and injury predominate over common questions. We disagree. Contesting causation, GPC notes some class members live closer to other industrial sources of pollution, specifically the active railroad tracks or the sewage treatment plant. But the industrial character of the surrounding neighborhood does not preclude a finding of nuisance. *See Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 180 (Iowa 2004) (affirming finding of nuisance from hog confinement facility, even though it was a "customary enterprise in the neighborhood"); *Bates v. Quality Ready-Mix Co.*, 261 Iowa 696, 704, 154 N.W.2d 852, 858 (1967) (affirming nuisance finding even though in commercial area). We also observe there was testimony indicating residents could distinguish between odors attributed to GPC and the sewage plant. *See Olden v. LaFarge Corp.*, 383 F.3d 495, 508 (6th Cir. 2004) (affirming certification when plaintiffs could show injury from contaminants directly attributable to defendant, despite other industrial sources in area).

We also do not see an issue in the plaintiffs' use of representative testimony to show classwide harm. In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court addressed whether representative evidence could be used in proving harm to employees. 577 U.S. \_\_\_, \_\_\_, 136 S. Ct. 1036, 1046 (2016). Employees alleged a violation of the Fair Labor Standards Act (FLSA) when an employer refused to compensate them for time donning and doffing protective clothing. *Id.* at \_\_\_, 136 S. Ct. at 1042. Because there were no records of time actually spent donning and doffing

and time varied among employees, plaintiffs relied on a representative sample to allow an expert to compute the average time spent. *Id.* at ___, 136 S. Ct. at 1043. The employer moved to set aside the jury verdict, arguing that the variation in donning and doffing time required individual inquiries preventing certification. *Id.* at ___, 136 S. Ct. at 1044. Under the FLSA, an employee bringing an individual claim was permitted to establish hours worked by producing sufficient evidence to permit a "just and reasonable inference." *Id.* at ___, 136 S. Ct. at 1047 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 1192 (1946), *superseded by statute as recognized in Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. ___, 135 S. Ct. 513 (2014)). As such, the Court concluded class action plaintiffs could use a representative sample to provide a reasonable inference of classwide harm. *Id.*

Similarly, the typical method of proving the objective "normal person in the community" standard for nuisance is to present representative, lay testimony from members of the community that they were disturbed by the condition. *See Gacke*, 684 N.W.2d at 180 ("The testimony of the plaintiffs *and of the witnesses they presented* convinced the court that normal persons would be and were substantially annoyed . . . ."); *Weinhold*, 555 N.W.2d at 460 (stating that lay witnesses presented from surrounding farms established offensiveness to persons of "ordinary sensibilities"); *Bates*, 261 Iowa at 702, 154 N.W.2d at 857 ("Other witnesses living in the vicinity testified to the noises and being disturbed by operation of the plant."). This is the method of proof proposed by the plaintiffs.

Moreover, we have previously approved the use of a formula employing reasonable inferences to calculate nuisance damages. *Miller*, 720 N.W.2d at 569. In *Miller*, neighbors claimed the defendants' grain-

harvesting activities constituted a nuisance. *Id.* at 566. Testimony confirmed that the defendants' "emissions during harvest season were so pervasive that they blanketed not only the plaintiffs' vehicles and personal property located outside their residences, but also filtered into the interior of the plaintiffs' homes." *Id.* at 569. Awarding damages for loss of enjoyment during harvest season, the district court used a per diem formula, compensating the plaintiffs at the rate of "$6 per hour for 16 hours a day for 90 days a year." *Id.* at 570. The defendants argued this calculation was in error, as "each plaintiff lived in different proximity to the defendants' property and was impacted differently by the defendants' grain storage activities." *Id.* at 571. In addition, the per diem formula did not account for hours each individual plaintiff may not have been present at the property. *Id.* We upheld the per diem calculation. *Id.* We noted,

> If the record is uncertain and speculative whether a party has sustained damages, the fact finder must deny recovery. But if the uncertainty is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can *infer or approximate the damages*.

*Id.* at 572 (emphasis added) (quoting *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996)). On this basis, we affirmed the district court's calculation, but reduced the damages of two plaintiffs: one because she did not primarily reside on the property and the other because she had negotiated for a lesser rent price because of the nuisance. *Id.* at 571–72. So long as the residents establish the emissions constituted a nuisance on each property (fact of harm), reasonable inferences may be used to approximate damages. *See id.*

GPC argues that class certification will deny it the fair opportunity to contest whether individual homeowners have suffered injury or

damage. We disagree. The plaintiffs have proposed a formula for damages. GPC can contest the appropriateness of that formula before the jury. If a special jury verdict is entered approving this formula and that verdict is supported by substantial evidence, then potentially this formula can be used in subsequent claims administration by the court while preserving GPC's due process and jury trial rights. If no damage formula is approved, then there would have to be subsequent individual trials on damages. Either way, GPC's rights would be protected.

A possibility that the class includes some uninjured residents will not bar certification at this time. Requiring plaintiffs to show every member of the class was exposed to contaminants at a high enough level to be considered a nuisance would "ask[] the court to make a class-certification ruling based on the merits of the case, something we have uniformly rejected." *Comes*, 696 N.W.2d at 325 (declining to require plaintiffs prove "*each class member actually paid some portion of a passed-on overcharge*" in an antitrust claim). Evidence plaintiffs suffered contamination at sufficient levels to recover for nuisance "goes to proof of damages, rather than to common liability issues." *Luttenegger*, 671 N.W.2d at 440 (holding that court did not have to make case-by-case determination of whether fee charged was improper at certification stage). "[T]he fact that a potential class action involves individual damage claims does not preclude certification when liability issues are common to the class." *Id.* (quoting *Iowa Trust*, 519 N.W.2d at 792).

GPC's objections at this stage to Dr. Rosenfeld's model are likewise unavailing. Assertions that "methods are flawed and incapable of calculating injury and damages to the class as a whole constitute[] a challenge going directly to the merits of the case and should not be resolved at this preliminary stage." *Anderson Contracting*, 776 N.W.2d at

855. At the certification stage, "[c]alculations need not be exact"; they must simply "be consistent" with liability, making just and reasonable inferences that are not speculative. *Comcast Corp. v. Behrend*, 569 U.S. ___, ___, 133 S. Ct. 1426, 1433 (2013). Moreover, GPC's defense that Dr. Rosenfeld's study is "unrepresentative or inaccurate" is "itself common to the claims made by all class members." *Bouaphakeo*, 577 U.S. at ___, 136 S. Ct. at 1047.

Class certification is supported by many cases applying equivalent rules. In *Sterling v. Velsicol Chemical Corporation*, the United States Court of Appeals for the Sixth Circuit addressed the propriety of a class action in a mass tort case alleging strict liability, common law negligence, trespass, and nuisance theories. 855 F.2d 1188, 1194 (6th Cir. 1988). The defendant allegedly deposited ultrahazardous material into a landfill, polluting groundwater used by neighboring residents. *Id.* at 1193. In affirming class certification, the Sixth Circuit stated,

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.
>
> In the instant case, each class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using the contaminated water. Almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and type of injuries allegedly suffered, and the defendant's liability.

*Id.* at 1197.

Other federal courts have affirmed class certification in tort actions brought by neighboring property owners over pollution to avoid the "duplicative litigation" of individual lawsuits. *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 67 (1st Cir. 2010); *see Olden*, 383 F.3d at 508 (affirming certification based in part on "common argument that the class's properties are regularly covered in cement dust, causing minor property damage"); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (affirming certification because "[t]he questions whether Met-Coil leaked TCE in violation of law and whether the TCE reached the soil and groundwater beneath the homes of the class members are common to all the class members"); *Navelski v. Int'l Paper Co.*, ___ F. Supp. 3d ___, ___, 2017 WL 1132569, at *18 (N.D. Fla. Mar. 25, 2017) (affirming certification of nuisance and negligence claims from dam collapsing "[b]ecause in this case, every aspect of liability can be resolved on a classwide basis, it would be neither efficient nor fair to anyone, including Defendant, to hold over 300 trials to hear the same evidence and decide the same liability issues"); *Mejdreck*, 2002 WL 1838141, at *7 (stating "it would be wholly inefficient to try thousands of separate cases that would allege the same misconduct and provide the same proof of such" in negligence and nuisance pollution claims); *LeClercq v. Lockformer Co.*, No. 00 C 7164, 2001 WL 199840, at *7 (N.D. Ill. Feb. 28, 2001) (noting proof "would be identical" as to "history of operations, the spillage, the impact on the land, soil, and water, [and] possible remedies" and "[r]epetitive discovery for individual cases on the same core issues would be wasteful"); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 480 (D. Colo. 1998) ("Significant elements of Plaintiffs' case in chief . . . will be presented through the testimony of five experts. This testimony will apply to the classes as a whole."); *Boggs*, 141 F.R.D. at 67 ("If these

claims were tried separately, the amount of repetition would be manifestly unjustified. To the extent that each claim of each plaintiff depends upon proof concerning the history of operations at the plant, the nature, timing, extent and cause of emissions, . . . that proof would be virtually identical in each case."); *Bates v. Tenco Servs., Inc.,* 132 F.R.D. 160, 164 (D.S.C. 1990) ("The common questions in this suit will be the cause of the ground water contamination, the defendants' liability, and the alleged effects of jet fuel contamination on the neighborhood and the people who have lived there."); *Wehner v. Syntex Corp.,* 117 F.R.D. 641, 645 (N.D. Cal. 1987) ("Significant judicial economies are served by trying the common issues [of contamination]."); *cf. Jackson v. Unocal Corp.,* 262 P.3d 874, 890 (Colo. 2011) (en banc) (concluding, in a state court case, common issues of asbestos contamination predominated despite individual damages issues); *7-Eleven Inc. v. Bowens,* 857 N.E.2d 382, 395 (Ind. Ct. App. 2006) ("Although these concerns [of individual issues] may be legitimate, we cannot conclude that they outweigh the economies of time, effort, and expense that will be achieved by allowing the class action to proceed on the issues defined by the trial court."); *Claborne v. Hous. Auth. of New Orleans,* 165 So. 3d 268, 284 (La. Ct. App. 2015) ("We also recognize that the risk in trying some 2900 individual cases could result in non-uniformity and inconsistent adjudications on the common issues."); *Doyle v. Fluor Corp.,* 199 S.W.3d 784, 789–90 (Mo. Ct. App. 2006) ("Although individual questions of damages or individual defenses may remain after the common issues here are resolved, the need for individualized proof . . . does not defeat the predominance of the common issues."); *Freeman v. Blue Ridge Paper Prods., Inc.,* 229 S.W.3d 694, 706 (Tenn. Ct. App. 2007) (concluding class action is superior because of single course of conduct).

Still other courts have declined to certify a class action for nuisance claims because of the individualized nature of determining contamination on each property. *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272 (3d Cir. 2011) ("[G]iven the potential difference in contamination on the properties, common issues do not predominate."); *Powell v. Tosh*, No. 5:09-CV-00121, 2013 WL 4418531, at *8 (W.D. Ky. Aug. 2, 2013) ("[E]ach Plaintiff's experience as to the intensity and duration (or lack thereof) of the hog odor is susceptible to marked variation. Further, each named Plaintiff's . . . property is situated uniquely with respect to the barns in question."); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 307 (S.D. Ala. 2006) ("[B]oth the existence of contamination and the risk of future contamination will have to be proven on a property-by-property basis."); *see also Ga.-Pac. Corp. v. Carter*, 265 S.W.3d 107, 114 (Ark. 2007) ("[I]t is evident, from the property owners' claims and from the sheer nature of a claim for private nuisance, that individual issues exist in the instant case as to whether and to what extent Georgia–Pacific's operation of its waste water treatment system caused consequences to, and constituted an unreasonable interference with, the property owners' use and enjoyment of their property.").[5]

---

[5]Courts have also declined to certify nuisance pollution cases when the plaintiffs failed to show a method of proving classwide harm. *See, e.g.*, *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 299 (W.D. Ky. 2008) ("Plaintiffs have alleged that Defendant's operations result in extensive emissions, but what remains missing is any evidence that the *cause* of the entire class's damages could be determined in a single proceeding."); *St. Joe Co. v. Leslie*, 912 So. 2d 21, 24 (Fla. Dist. Ct. App. 2005) ("Appellees failed to prove how the class representatives could prove their own . . . nuisance claims, thereby proving the claims of the unnamed members."); *Ga.-Pac. Consumer Prods., LP v. Ratner*, 762 S.E.2d 419, 423 (Ga. 2014) (reversing order to certify air pollution class because members had not presented "evidence by which the plaintiffs might be able to prove [harm] on a classwide basis" such as scientific evidence about how much pollution moved through the air). By contrast, the plaintiffs here have offered expert testimony and a common method for proving their claims against GPC.

GPC relies on a decision by the Eighth Circuit filed after the class certification order here. *See Ebert,* 823 F.3d at 475, 481. In *Ebert,* the district court certified a class action against General Mills brought by neighboring property owners arising from groundwater contamination. *Id.* at 476. The defendant had disposed of hazardous chemicals by burying perforated drums of trichloroethylene (TCE) on its land. *Id.* at 475. "[T]he plaintiffs claim[ed] . . . TCE vapors migrated into the surrounding residential area, threatening the health of the residents and diminishing the value of their property." *Id.* The Eighth Circuit panel agreed the "standardized conduct of alleged contamination and the remedies sought by the class are common to all plaintiffs." *Id.* at 478. Yet the appellate court reversed the certification order after concluding that individual issues predominated:

> To resolve liability there must be a determination as to whether vapor contamination, if any, threatens or exists on each individual property as a result of General Mills' actions, and, if so, whether that contamination is wholly, or actually, attributable to General Mills in each instance. Accordingly, accompanying a determination regarding General Mills' actions, there likely will be a property-by-property assessment of additional upgradient (or other) sources of contamination, whether unique conditions and features of the property create the potential for vapor intrusion, whether (and to what extent) the groundwater beneath a property is contaminated, whether mitigation has occurred at the property, or whether each individual plaintiff acquired the property prior to or after the alleged diminution in value.

*Id.* at 479.

*Ebert* is distinguishable. Tracking the migration of contaminated groundwater in that case involved more complex variables than GPC's smokestack pollution blanketing its Muscatine neighborhood with airborne particulates. And the *Ebert* plaintiffs sought recovery for diminution in property values, raising valuation issues unique to each

property. *Id.* at 479; *see also Mel Foster Co. Props., Inc. v. Am. Oil Co.*, 427 N.W.2d 171, 176 (Iowa 1988) (noting measure of damages in nuisance case for diminution of value is "the market value of [the] property immediately before contamination and the market value of that property after the contamination"). By contrast, the class members here are not seeking recovery for any reduction in their property values, but rather for their shared experiences with GPC's smoke, odor, and dust.

We hold that the district court did not abuse its discretion in rejecting GPC's predominance objection to class certification. Our class action rules do not require that the residents present "common proof on each element of the claim. Rather, we have repeatedly noted that the existence of individual issues is not necessarily fatal to class certification." *Comes*, 696 N.W.2d at 322 (quoting *Howe*, 656 N.W.2d at 289). Individual issues concerning contamination from other sources or the amount of chemicals present on a particular property may affect damage calculations, but such concerns do not overwhelm common issues of liability. GPC's priority of location is conceded, and common proof will be required on GPC's course of conduct, its emissions during the relevant time period, its knowledge of emissions, and at what level emissions interfere with a normal person in the community's enjoyment of his or her property. These common questions of liability are at the heart of the residents' claims.

**B. Whether Certifying the Class Offends Due Process.** We next address GPC's contention that the class certification violates its due process rights. "Civil litigation deprives the litigants of property—the plaintiff of her chose in action, the defendant of money damages if it loses—and thus must accord the litigants due process of law." *Newberg* § 11:21 (footnote omitted). "A defendant in a class action has a due

process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).

> Extrapolation raises due process concerns because it provides a full trial, and opportunity to be heard, for some plaintiffs but not for others and, correlatively, because it enables the defendant to contest damages through individualized affirmative defenses against some plaintiffs but not all.

*Newberg* § 11:21.

GPC asserts the residents' plan to extrapolate harm to surrounding properties from testimony of twenty to thirty representative class members violates due process by masking individual issues. GPC argues it must be allowed to pursue individual factors that might reduce certain class members' damages, such as the members' knowledge of the air pollution upon moving to the community. GPC relies on *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990). In *Fibreboard*, the district court certified a class of over 3000 asbestos claims. *Id.* at 707. To assess damages, it proposed to try a small, limited segment of claims in full, then extrapolate from those individualized awards to an omnibus award for the class. *Id.* at 708–09. From those witnesses, the jury would extrapolate damages to the class as a whole. *Id.* at 709. The Fifth Circuit, in granting mandamus to prevent trial, recognized that such extrapolation violated the defendant's rights by masking differences in causation, types of injury, fact of injury, and exposure. *Id.* at 711.

*Fibreboard* is inapposite. In *Fibreboard*, the claims presented were more diverse than here. Plaintiffs suffered different *personal* injuries, from different causes, over different periods of time. Here, the residents are not claiming personal injuries. Rather, they seek recovery for the

loss of use and enjoyment of their property caused by GPC's emissions. The district court has not limited the number of witnesses GPC can present, nor its exploration of individual defenses.

Moreover, the Supreme Court has indicated inferences from representative proof are permissible in certain circumstances. In *Dukes*, the Court rejected the use of testimony from a sample of 120 Wal-Mart employees because it found all members of the class were not similarly situated and the plaintiffs lacked evidence the sample was representative. 564 U.S. at 367, 131 S. Ct. at 2561. But five years later, in *Bouaphakeo*, the Court allowed representative evidence compiled by an expert to establish employee's average donning and doffing time. 577 U.S. at ___, 136 S. Ct. at 1044–45. Explaining this difference, the Court stated,

> The underlying question in *Wal-Mart*, as here, was whether the sample at issue could have been used to establish liability in an individual action. Since the Court held that the employees were not similarly situated, none of them could have prevailed in an individual suit by relying of depositions detailing the ways in which other employees were discriminated against by their particular store managers. . . .
>
> In contrast, the study here could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action. While the experiences of the employees in *Wal-Mart* bore little relationship to one another, in this case each employee worked in the same facility, did similar work, and was paid under the same policy. . . . [U]nder these circumstances the experiences of a subset of employees can be probative as to the experiences of all of them.

*Id.* at ___, 136 S. Ct. at 1048. We have allowed testimony from community residents in nuisance actions to prove the "normal person" standard. The plaintiffs plan to call witnesses from throughout the neighborhood. GPC is free to call additional witnesses. As we have

already discussed, this class action can proceed in a manner that preserves GPC's due process rights to contest harm and damages suffered by individual class members.

If proof of individual defenses becomes unmanageable, the district court has discretion to bifurcate the trial, create additional subclasses, or decertify the class.

> [B]ifurcation enables the common issue of liability to be resolved in an aggregate proceeding but reserves the assessment of individual damages for some subsequent, more individualized processing. Courts have therefore held that bifurcation assists certification by responding to due process concerns.

*Newberg* § 11:10 (footnote omitted). At this stage of the case, GPC has not shown the class certification order violates its due process rights.

## IV. Disposition.

For these reasons, we affirm the district court's order certifying this class action.

**DISTRICT COURT CLASS CERTIFICATION ORDER AFFIRMED.**

All justices concur except Appel, J., who concurs specially.

#15–1942, *Freeman v. Grain Processing Corp.*

**APPEL, Justice (concurring specially).**

I concur in the generally thorough majority opinion in this case. I write separately, however, to emphasize the difference between Iowa law and federal law on the question of class certification.

Iowa is one of two states that have adopted a version of the Uniform Class Actions Act. Thomas D. Rowe, Jr., *State and Foreign Class-Actions Rules and Statutes: Differences from—and Lessons for?—Federal Rule 23*, 35 W. St. U. L. Rev. 147, 150 (2007). One of the purposes of the Uniform Class Actions Act was to create a more generous standard for class certification because "federal courts have severely restricted the availability of class actions in their forum." Irving Scher, *Opening State Courts to Class Actions: The Uniform Class Actions Act*, 32 Business Lawyer 75, 86 (1976). Consistent with the Uniform Class Actions Act upon which they are based, Iowa courts have consistently stated "[o]ur class-action rules are remedial in nature and should be liberally construed to favor the maintenance of class actions." *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 320 (Iowa 2005); *accord Anderson Contracting, Inc. v. DSM Copolymers, Inc.*, 776 N.W.2d 846, 848 (Iowa 2009); *Lucas v. Pioneer, Inc.*, 256 N.W.2d 167, 175 (Iowa 1977). In light of this legislative history and our caselaw, federal class action precedent is of limited value in determining class certification under Iowa law.